May it please the Court, I'm Karen Landau and I represent Gerald Wolfe. I'll reserve four minutes for rebuttal. There are three significant issues pertaining to the conviction today, and I'll try to cover all three, but I'm going to focus on the Brady issue. Could you help me with something on that? Sure. I actually thought you had a pretty good case that the government had no good excuse for not giving you the other files. However, I couldn't see where it would make any difference. We are. In particular, the guy basically signed papers saying he was buying, what was it, nine houses for personal occupancy, and I couldn't see how he could live in that many houses. That's a lot of toothbrushes. Well, let me address that, Your Honor. And I think that's probably just what the jury thought. That may be, but this case is somewhat different than most mortgage fraud cases in that there was the signatures were, the validity of the signatures is seriously in doubt. And it's true that Andrew, the chief cooperator, Andrew Bohuslavitsky, testified that Mr. Wolfe signed the owner occupancy declarations. But, in fact, if you look at the signatures, it's not clear, and then later, well, let me start with this. First he said these are his signatures. Then later he says, well, I really don't know which signatures are his and which are mine. I know that these are my brother Wolfe's signatures, and, in fact, that signature is somewhat different. But there were a number of signatures that first Bohuslavitsky said they are Mr. Wolfe's signatures, and then he said, well, I'm not sure maybe they're mine. And so if you look at the signatures, you know, some of them are different. Some of them are awfully similar. It's equally likely that Mr. Bohuslavitsky was simply a very good forger. It's very difficult to determine what's what. And that takes this case out of the realm of. His credibility was so effectively impeached. But, you know what, Your Honor, there is a difference, and this is where I have to respectfully disagree. There is a big difference between somebody who commits a lot of fraud and then purports to come clean and cooperate, and the government is basically standing behind that person. And certainly the government stood behind Mr. Bohuslavitsky. But this guy admitted on the stand he was still committing fraud. He wasn't paying any of his restitution, still living high on the hog and not complying with his deal. He was living high on the hog, but that's different from committing fraud. And, I mean, there really is a big difference between not paying restitution, and I think a lot of jurors would see that. And he hadn't been sentenced yet, so technically the restitution obligation had not come into effect. He is living high on the hog, but there's a difference between that and actively committing loan fraud by trying to extract yet more money from Countrywide, which is the inference that's allowed by that. Wasn't there plenty of evidence about his motivation and a pretty strong argument that the only reason he was testifying was to point the finger away from him and his family and his own plan? There was, but again, I think there's a big difference between, you know, it was pretty clear his brother was in it. So the brother, Will Bohuslavsky, you know, they're both cooperating even though Will doesn't testify. Yes, there's evidence that maybe the uncle and the father-in-law are involved and he wants to protect them, but protecting your wife is a whole different level of protection. It's a lot, it's kind of like, I mean, it's not directly analogous, but if you look at Coring, you know, the witness is a cooperator and he's trying to protect himself. Then you find out, you know, they find out after the fact he's being investigated for sexual misconduct charges. This court held that as materially different. When we look at cooperation, because, I mean, the government uses, you know, cooperating what this is all the time and they're entitled to do that. But it's, I do think there is a line between free, you know, conduct that's found out, and I guess I'm going back to, I don't know if I'm, I'm not directly addressing your point, Judge Graber, but there is a line between fraud that's committed before cooperation, because after all that's what the witness is cooperating for, and misconduct, criminal misconduct that's committed after the fact. Now, as far as, and again, as far as the motive, I do think a wife, there's a lot stronger, I mean, sure, you're going to cooperate to save your in-laws and your uncle, but your wife, you know, that's a big deal. That is a different, that is a horse of a different color. Unless you don't want your wife anymore, maybe, you know, not always. Have I, okay. So, moving on. The thing about what the continuation of Bohuslavsky's or Bohuslavitsky's conduct was, was the government always presents or usually presents these people as people who are living a dissolute life and doing all kinds of crimes, and then they decided to shape up, come clean, and now they're going to repent and be good people. And there was no way this Bohuslavitsky fellow could be portrayed that way. Well, but the government tried. I mean, another point is how much they, first of all, they really needed him because the documents, unlike in many cases, the documents were not trustworthy. You know, many mortgage fraud cases are solely dependent on the documents, and there's, you know, there's no debate, but here they weren't. And the thing is that he, they really, for example, the last witness the government called, the FBI agent who testified to a variety of things, also testified that, in fact, Bohuslavitsky did not attempt to direct the investigation. He only responded to his questions. So the government emphasized that Bohuslavitsky, yeah, he was dirty, he was a fraudster, and now he's being good, he's taking responsibility. And, again, some of the impeachment that was attempted fell flat. Like, you know, the defense counsel spent a lot of time on the fact, well, now you've downsized to 100,000. How would it have been any better? I mean, the only thing you've gotten, the 7,000 pages, that's a little bit better, maybe, is it shows his wife's involvement, possibly. Well, and the loan, that he's still committing fraud after he's, in other words, he's pleaded guilty, he's got this deal, and he goes out and he's still trying to extract real estate commissions out of country, right on a short sale. That's pretty fraudulent. And the idea that it's not fraudulent because his employer was revealed, that's just not a, that's not a viable answer because, you know, these, they're handling a million of these loan workouts, and they're not looking at everything carefully. Just this time they happened to catch him, that, hey, look at this. And even after they catch him, he has his lawyer try to get the commission out of country. Why? That's really a little bit unusual, I would say. How would it be different? I think it would have allowed the defense to argue, you know, more credibly that he was completely unreliable, that he, you know, not only did he, was he the architect of this scheme, he's still committing fraud even after he's been, even after he's been cooperating, pleaded guilty. What are the other two issues that you wanted us to focus on? You're right, I am running out. I would like to also address the issue of the pre-arrest silence. That is, the government has argued that's harmless. Again, that is not harmless precisely because there was very little evidence of consciousness of guilt. It is the most compelling evidence of consciousness of guilt, and it obviously was admitted. Now, there is, you know, the question is what does Salinas mean after, what does Salinas mean? Does Salinas so undermine this court's ruling in Opplinger that this court should, you know, essentially adopt the rule that pre-arrest silence cannot be commented on, at least if there is an invocation of Fifth Amendment rights? I would submit that it does. I think you've got a good point, that you can distinguish the cases where the silence is with someone who's not an officer and someone who is. Silence with the FBI being a little different from silence with your boss or something, and arguably more damning. But I also can't see where it mattered that much. Well, again, we come back to where it matters is we have a Brady violation. We have a, we'll look at that cumulatively, but even if you look at it separately, again, consciousness of guilt is one of those things. And juries, most people naturally think that silence, silence matters, silence indicates guilt. There wasn't evidence of consciousness of guilt. The government contended that the refinances were evidence of consciousness of guilt, but they're equally susceptible of an innocent interpretation. And here, the, it's not harmless because, again, it's noteworthy that the last witness on the stand, the last government witness is the one who testifies, yeah, you know, I wanted to talk to him, and the meeting was, first he wouldn't talk to me. He said it wasn't the time, which is an invocation. Then the meeting was canceled. That's the last thing the jury hears. The first thing isn't damning at all. I mean, if somebody comes in at five of nine and says, I want to talk to you, I have to go downstairs. Other people have appointments or just plans for their day. I don't think that's damning at all. Probably half the jurors would have thought the same thing that I'm thinking, that somebody says, I want to talk to you now, and they're busy. But then the meeting's canceled. And the jury isn't told, and probably rightfully so, but the jury isn't told that his lawyer canceled the meeting. But, you know, Your Honor, I guess maybe we have to agree to disagree on that. I think a lot of jurors would say, gee, he didn't want to talk to the FBI. The cancellation is more interesting. That's evidence of guilty. But I think both together convey a message of consciousness of guilt. With that, I will reserve the rest of my time for the rebuttal. You may do so. Thank you. Thank you. May it please the Court, Joe McNally on behalf of the United States. Let me start by talking about the Brady issue. And I think, Judge Kleinfeld, going to some of the questions that you asked in terms of who Andy Bohuslavsky was at the end of cross-examination. This is a case where, with the preliminary matter that concerns me, we keep getting Brady issues. Why didn't the government give him the documents? I think what I could tell the Court is that this was a mistake. I mean, you dump 7,000 documents on him, and I think they won't get through him anyway. And if they do, and it turns out the fellow is not guilty, they should know. And I think the right thing for the government certainly to do is just produce stuff. We have an open discovery policy, at least I do as a prosecutor. I was a prosecutor in this case. The FBI found him in the storage room after the verdict. They contacted us, and we made a mistake, and we did the right thing by turning him over and allowing him to be aired in open court. Let me ask you about that, counsel. As the prosecutor in this case, did you review the FBI, FD-192, the inventory of the FBI before trial? I did. Were they – that's what I'm trying to understand what happened here. These were documents that, for whatever reason, they were not on that. They were subpoenaed, I think, in connection with the investigation initially of the Bohuslavskys because they related to their loans, and they came in and began cooperating. And so I think as a result of that, it was never really part of the case that focused on Gerald Wolff. So just so I understand that they were not on the FD-192. No, they were not on any of the inventory that the government has seen. And were these documents – can you give us an idea of – I know it's – I've heard 7,000 pages. It's a certain number of loan files. Can you tell us how many loan files were turned over in the proper course and how many were not? I think over 30 were turned over relating to all of the properties that he acquired and then some additional ones, and then essentially you're talking about five files that were not Wolff files but were cooperator files. Now, as to these five files, were those properties referenced in any of the discovery that was produced? Some of them were, yes. Because – and I – I mean, obviously we all – I think we all agree – I think everyone in the court agrees they should have been turned over before trial. What I'm trying to determine is for Brady purposes, was there any reason why the defense could not have subpoenaed those on their own? Is there anything that would have prevented them from identifying these loan files in the first place? I think that they could have identified the loan files and subpoenaed them, but certainly the government had them. We had access to them and should have turned them over. You know, they were well aware, and it was a subject throughout cross-examination, about all of the Bohuslavisky's other frauds with respect to their own properties, and indeed Andrew Bohuslavisky admitted that his fraud extended well beyond Gerald Wolff, and indeed he had been doing fraud with others, including the Stricklers and some of these other people that he was involved with. How could the mistake be made? Wouldn't there be just a whole bunch of shelves of those banker's boxes that he used to store files with the magic marker on them saying Bohuslavisky or Wolff? These were in a different area. They were in a different area than all the stuff that was focused on Wolff. Geographically or, you know, different? Physically. Physically. You know, when the case started out, you know, it was initially focused on Bohuslavisky, and then they immediately came in and started cooperating, and it shifted to Wolff, and so these were subpoenaed, and my understanding is they came in, you know, after the fact, and they were never opened, they were never reviewed by the government, and so it was a mistake that was made, but albeit one that I think in this particular case, based on these facts, really what we're getting down to is a couple of paragraphs in lender notes that I Would you respond directly to Ms. Landau's discussion of materiality? Because that's really where we are. It seems that everything else about the Brady violation is conceded, and we're really down to materiality. Sure. Let me start off by talking a little bit about the two-and-a-half-day cross-examination of Gerald Wolff, and I think that when the court – Of Wolff? I'm sorry, of Bohuslavisky, and I think that when the court looks at that in its totality, it doesn't take a lot to conclude that this is a cooperator who was absolutely raked over the coals and probably was left with very little credibility in the eyes of the jury. I mean, some of the things that were elicited on cross, and this is after a three-hour direct examination, and two-day cross, that Bohuslavisky and his brother admit they were the masterminds of the fraud, that the fraud began well before they started dealing with Mr. Wolff in 2001, that they used CPA letters, they used fraudulent employment verification letters, that he had told a lot of lies in his young life. I think that the evidence was so significant in terms of really impeaching him that the district court went the extra step of not just giving the standard cooperation Ninth Circuit instruction, but he gave a separate instruction to the jury that you can look at that says that you've heard evidence that this individual is an admitted perjurer and forger, and you should really weigh that in evaluating his credibility. So I think that that is just, I think, some of the flavor in terms of the cooperation. In addition, they elicited significant testimony that even after his cooperation, he files a lawsuit where he alleges that Gerald Wolff was the mastermind of the scheme, and ultimately- He admits as a liar. Yeah. I think if you look at the back and forth, he frankly kind of dodges it at first and says, yeah, well, my lawyer wrote it, and then admits that he had knowledge of it, and then eventually says, yes, that wasn't completely true because we're the ones that went to Wolff. He didn't come to us. And so I think even post-cooperation, the cooperator in front of the jury was not some choir boy, and I don't think that the jury could have walked away with that impression in light of the extensive cooperation. In addition, they elicited testimony that, you know, this isn't a guy really who had changed very much. He switched from a $200,000 BMW to a $100,000 BMW. He, instead of, you know, trying to pay any type of restitution, joined Shady Canyon Country Club, which is probably the nicest country club in Orange County, for the tune of $90,000. And so you have, I think, a pattern of behavior that continues post-cooperation. And so what I would submit is that at the end, you're left with a cooperator that was pretty cut off in terms of credibility. And I think that the district court, appropriately so in this case, in light of the impeachment material on him, instructed the jury, gave an extra instruction instructing the jury that he was a perjurer, an admitted perjurer. And I think that what you come back to, I think, in terms of the nature of the jury, wasn't whether he was a lying crook then. It was, is he a lying crook now? I think that's right. And I think that, you know, the government's case, contrary to defendant's arguments, did not entirely rest on Bohuslavisky. It rested consistently on the things that defendant did that, when viewed collectively, one of the things that the defendant does in their brief is said, well, you can look at any single fact and it has an innocent explanation. And, well, that may be true at times when you look at them collectively and when you evaluate them in the context of the entirety of the record and the entirety of the testimony, the conclusion that he was a knowing and willing participant in this isn't escapable. And let me give you some examples. You know, he transfers his wife's name, his property into his wife's name only, which in itself, certainly there was innocuous reason, but I think that needs to be viewed in the context of the lender's testimony that ultimately in order to achieve this owner occupancy fraud, you would have to get that off your credit report or you'd have somebody asking questions. And you look at the timing of that. That's in June. October, he creates Douglas Designs, a company that there's no legitimate explanation at trial other than this is a company that, ultimately, he's receiving these overages, these kickbacks in. The lenders testified that they would not get cash back on 100% purchase if, because they were putting all the money down, they wouldn't kick money back to a buyer, but that if it appeared to be going to a seller, which it did in this case, it didn't appear to be associated with a buyer, which it didn't because it was Douglas Designs, that ultimately that would enable the scheme to work. And so you take those two facts. Then you get to, I think, what is the most compelling of all, and I would be interested to see what the defendant says about it in the rebuttal, which is he's payments to straw buyers. And I think that that. I'm sorry. I couldn't hear you. Payments to straw buyers. Payments to straw buyers. And so nine of the homes were obtained in Wolf's own name, 21 in other names. And the reason for that was that both of the Slaviskys only had ten lenders, and you could only obtain one loan, obviously, owner-occupied loan per lender. And there is no rational explanation for paying people $200,000, you know, $10,000 per loan, to obtain something that you can obtain lawfully. The only reason to make those payments was because Mr. Wolf knew that there was no way the banks would make those loans to him because they would discover the owner-occupancy problem. Before you run out of time, I'd like you to address the pre-arrest silence argument made by opposing counsel. Sure. I think that the issue, Your Honor, is controlled by this case's decision in Opplinger. Why isn't that distinguishable? Because that wasn't an FBI agent. I think it was some private person. I can't remember who. And I do cite it in the brief, and I can get the cite for you, Your Honor. Take a look at Beckman. And I think that Beckman is actually a case that's pretty analogous. Beckman's a case where a guy is popped at the border in San Diego with drugs in his car, and he ultimately, at trial, says that he met a guy while he was drinking at a bar in Tijuana, and that guy asked him to drive the car across. And the government ultimately goes on to argue that if that was true, and if he had been duped, he would have said that to the border-crossing agent. And the defendant objected, and ultimately the court held that that was a permissible inference because it was pre-arrest, pre-Miranda silence, consistent with this court's decisions in Geis and Opplinger. So Opplinger does deal with private parties, but Beckman actually deals with a situation where the government's actually commenting on it. I think the bigger issue, and, you know, obviously Beckman, Opplinger, all of these could frankly change in light of the circuit split. And one of the reasons why I think the government went on to really focus on the harmlessness here is because of that. And so I would ask the court also not just to affirm in light of the precedents, but ultimately reach for finality purposes the harmlessness issue. And I think that the most compelling part of it is the district court, Opplinger, Beckman aside, decided out of an abundance of caution here, and I think exercised some wisdom that, you know, this was an area of the law that could change, and ultimately instructed the jury very specifically that they were to draw no inference at all from the fact that the defendant declined to talk to the FBI. And, you know, one of the things that the defendant says in the reply brief is, that happened in Ocoton, too, and the court nonetheless reversed the conviction. And that frankly just isn't true. If you look at the last page of Ocoton, what happened was the district court refused to give a very specific instruction. They refused to instruct specifically that the encounter at the border or after the border with that customs officer where he loaded up could not be relied on. And instead what the district court did was they just stuck with the general discussion or the general instruction that they could not draw any inference from the fact that the defendant did not testify at trial. And what the appellate court said was that that instruction that he, you know, not that the jury not draw any inference from the fact the defendant didn't testify at trial couldn't be reasonably understood to tell the jury not to draw an inference from the out of trial silence. And so that is what's distinguishable. I think that frankly the characterization in the reply brief is just wrong. The district court here told the jury don't rely on this fact at all. And I think that that deserves significant weight. Certainly there's an analysis there that, you know, this wasn't the thrust of the government's case. It wasn't a principal means through obtaining a conviction. I think that if I could just go back to, I think, you know, the notion of the overwhelming evidence, one of the other things that's not addressed in the reply brief is, you know, the defendant's argument the entire time is that he's an innocent dupe. And I think that you have to evaluate the evidence and ultimately come to the conclusion that the evidence is overwhelming in the premise of that defense. And first of all, this guy's a lawyer and a mortgage broker. He's not a guy on the street who has no experience. Secondly, that really can't be squared with some of his actions. For example, when John Axton from HSBC makes contact and ultimately says, hey, what's Douglas Design and what are these payments for, the defendant tells him Douglas Designs is a landscaping company. And so what I'd ask the court to do, and I think what the jury did, was they put themselves in the framework of what would the innocent dupe do. And what the innocent dupe would say is he'd be transparent. He'd say, well, I set it up to get these cash payments back because my mortgage brokers told me that. And that's not how this plays out. And so I would encourage the court, when you really unpeel the onion, all of the post-conduct is just not consistent with somebody who had been duped. He continues to refinance all of these properties with Bohuslaviskis. So this guy's a lawyer who. What about the forgeries? I mean, one of the really damning things was he keeps buying all these owner-occupied houses that aren't. And the answer in argument just now is, well, had they seen more, the jury might have thought a signature was forged when he appeared to. That was, well, that was aired before the jury. I mean, a forgery argument was thoroughly aired time and time again before the jury, where they would say that this was a forgery. It wasn't. And in some cases, I think frankly it goes to maybe the fact that they found on some things Bohuslaviski was credible. Sometimes Bohuslaviski would say, yeah, that's his. Other times he'd say, I don't know, that's one I may have signed, but always with the permission of the defendant. I mean, one of the things that was happening is in order to make this scheme work, Judge, you had to close on these very quickly. Otherwise, the banks would start seeing them on the credit report. And so the agreement was on the initial drafts, they would sign for Wolf. And what I tell the court, though, is this isn't a case where the government went and made this about signatures. The other thing I would look at, and I think it goes to that, is take a look at the CPA letter, and that's a footnote in the government's brief. Again, this guy's an innocent duke, but he's going, when he's refinancing his properties, he goes to his CPA and says, give me a CPA letter that says that my wife makes $40,000 a month at Simplicity Home and Office, $400,000-plus a year. CPA testifies at trial, yeah, I was his accountant, not aware of any such payments. Thank you, counsel. Ms. Landau, you have some time remaining. Thank you, Your Honor. We have a lot to cover here. I did want to address one of Judge Owen's questions about why the files weren't turned over. I understand that's not what the court's focused on. But I think what the government said was telling, you know, we subpoenaed these files, and then once they started cooperating, the focus changed. That's not very compelling. I mean, the government is obliged to look at their cooperators and to provide the evidence. So I'm going to leave that at that. You know, yes, Bogus Levitsky's testimony, he was cross-examined with what they had. I think the government's characterization that he was thoroughly discredited is really not correct. Reading the record, Bogus Levitsky is very firm in standing up for himself. And I think one of the things that came up was the car, the issue of, oh, he was leasing. He had this expensive car, and finally he says, hey, look, the car is leased. Well, lots of people lease expensive cars, lots of people. I don't think that the fact he leased, that does not show him as some unrepentant, dissolute individual. Yes, they showed about the country club. Again, not illegal. Yes, he's not paying restitution. He hasn't even been sentenced. He's living his life. He's cooperating. I'm not so convinced that the jury said, oh, you know, this guy is completely unbelievable. I've read Mr. Biener's closing, and it was very well done. Yes. How would it have been different if he had these five loan files? What different themes or what would he have said different than what he said? One thing he could have said, look, this guy is not only not unrepentant, he's still committing fraud. He's committing fraud against Countrywide. He committed fraud against Countrywide originally. He's committing fraud against Countrywide now, and he's trying to fool you now. The he's trying to fool you part would be the same. But, again, the fact is he's still committing fraud now. That's different. The wife, I can't think of a stronger motivation to cooperate and to direct. It would have undermined Whelan's testimony, that Agent Whelan's testimony, that Bogus Levitsky wasn't trying to direct the investigation. There's also, I mean, the fact is the government said, oh, well, we weren't going to prosecute the wife. We weren't going to prosecute these other people. You know, they can say that. The fact is the wife wasn't prosecuted. There's no indication she was investigated. You know, there was more to pursue. I mean, that, you know, seeing her name on that loan application, that's, and her maiden name, which is, you know, Grady and Bogus Levitsky, very different names. I mean, that's the key part of this is that she's involved. So I think that would have changed things. And, you know, again, I think as far as Oplinger, you know, the Oplinger argument is addressed in the brief. There's a lot of permutations of that. You know, we could talk about that alone for another half an hour, but I don't think that's necessary. You know, in sum, this is a case where the government's error, and no one's accusing the government of bad faith, but the government made a mistake. They weren't careful enough, and it affected the outcome of the trial. The conviction should be reversed. Thank you, counsel. The case just argued is submitted, and we appreciate very helpful arguments from both of you.
judges: Kleinfeld, Graber, Owens